United States District Court
Southern District of Texas
**ENTERED**
August 09, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| JAMIE MORENO and OLGA MORENO, | § § § § | |
| Plaintiffs. | § § | CIVIL ACTION NO. 3:20-cv-00300 |
| VS. | § § | |
| ALLISON MEDICAL, INC., | § § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Before me is Defendant's Motion for Summary Judgment. *See* Dkt. 45. After reviewing the motion, the parties' briefing, the record, and the applicable law, I recommend that the motion be **GRANTED**, and the case be dismissed.

### I. BACKGROUND

This is a products liability action arising out of the manufacture, marketing, distribution, and sale of a 31-gauge Sure Comfort Insulin Syringe ("Syringe").

In late 2014, Plaintiff Jamie Moreno ("Moreno") began self-administering an erectile dysfunction ("ED") medication injected directly into the penis. For roughly five years, all went smoothly. That all changed on September 23, 2019. On that day, Moreno administered his ED medication using a Syringe purportedly sold by Defendant Allison Medical, Inc. ("Allison Medical"). Upon withdrawing the needle from his penis, Moreno noticed that part of the needle was missing. A CT scan would later confirm that a portion of the Syringe needle broke off inside the shaft of Moreno's penis during the injection process. Moreno underwent surgery to remove the foreign object.

In September 2020, Moreno and his wife, Olga Moreno (collectively, "Plaintiffs"), sued Allison Medical. The live pleading, Plaintiffs' Second Amended Complaint, asserts claims of strict liability, negligence, violations of the Texas

Deceptive Trade Practices Act, and breach of express warranty, breaches of implied warranty of merchantability and fitness for a particular purpose. *See* Dkt. 30 at 7–17.

Allison Medical has moved for summary judgment, arguing that there is no evidence to support Plaintiffs' claims. Specifically, Allison Medical contends there is no evidence that the Syringe was defective. Rather, Allison Medical insists that the evidence conclusively proves Moreno misused the Syringe. On this point, Allison Medical emphasizes that its Syringes are designed and intended solely for the subcutaneous administration of diabetic insulin; in fact, the Syringe Moreno used on that fateful day contains a prominent warning that it is to be used for "U-100 INSULIN ONLY."



Dkt. 45 at 2.

Allison Medical's Motion for Summary Judgment has been fully briefed and is ripe for adjudication.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the non-movant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017). The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This does not, however, require that the movant negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

If the burden of proof at trial lies with the non-moving party, the movant may satisfy its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. *See Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) ("Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." (quotation omitted)). Once the moving party has demonstrated the absence of a material fact issue, the non-moving party must go beyond the pleadings and designate specific facts and evidence in the record and articulate how they support the party's claim(s). *See Boudreaux*, 402 F.3d at 540; FED. R. CIV. P. 56(c)(1). "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (quotation omitted).

In deciding a motion for summary judgment, I must "view the evidence and the inferences to be drawn therefrom in the light most favorable to the non-moving party." *Brown*, 337 F.3d at 541. I must also resolve factual controversies in favor of the non-moving party. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). However, "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant," I must grant summary judgment for the moving party. *Boudreaux*, 402 F.3d at 540 (quotation omitted).

## III.  ANALYSIS

### A.  STRICT PRODUCTS LIABILITY

Plaintiffs first assert a strict product liability claim. Under Texas law, section 402A of the Restatement (Second) of Torts governs claims for strict liability. *See Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997). Section 402A provides:

> (1)  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>   (a)  the seller is engaged in the business of selling such a product, and
>
>   (b)  it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (1965). A product may be unreasonably dangerous due to a physical defect (manufacturing defect), a defect in the product's design (design defect), or a failure of the manufacturer to warn or instruct on the proper use of the product (marketing defect). *See Grinnell*, 951 S.W.2d at 426.

As best I can tell, Plaintiffs assert strict-liability claims for manufacturing and marketing defects.[1] Critical to my analysis is that Plaintiffs readily admit that Shina Med Corporation ("Shina Med"), a South Korean entity, designed and manufactured the Syringes. *See* Dkt. 50 at 14. This presents a significant hurdle for Plaintiffs' theory of liability, at least with regard to their strict-liability claims.

---

[1] To succeed on a design defect claim, the plaintiff must show, among other things, that a safer alternative design existed. *See Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 330 (5th Cir. 2014); TEX. CIV. PRAC. & REM. CODE § 82.005(a). Although Plaintiffs' Second Amended Complaint frequently uses the term "design," Plaintiffs' pleadings and briefs never once so much as allude to a potential alternative design. There is certainly no evidence in the summary judgment record that supports recovery on a design defect claim.

4

### 1. *Innocent Seller*

Under Texas law, "[a] seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves" one of seven exceptions. TEX. CIV. PRAC. & REM. CODE § 82.003(a). The seven exceptions are:

(1) that the seller participated in the design of the product;

(2) that the seller altered or modified the product and the claimant's harm resulted from that alteration or modification;

(3) that the seller installed the product, or had the product installed, on another product and the claimant's harm resulted from the product's installation onto the assembled product;

(4) that:
- (A) the seller exercised substantial control over the content of a warning or instruction that accompanied the product;
- (B) the warning or instruction was inadequate; and
- (C) the claimant's harm resulted from the inadequacy of the warning or instruction;

(5) that:
- (A) the seller made an express factual representation about an aspect of the product;
- (B) the representation was incorrect;
- (C) the claimant relied on the representation in obtaining or using the product; and
- (D) if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm;

(6) that:
- (A) the seller actually knew of a defect to the product at the time the seller supplied the product; and
- (B) the claimant's harm resulted from the defect; or

(7) that the manufacturer of the product is:
- (A) insolvent; or

(B) not subject to the jurisdiction of the court.

*Id*. The burden of proving one of the seven exceptions listed in § 82.003 is on the plaintiff. *See Gonzalez v. Estes, Inc.*, No. SA-10-CA-0038-XR, 2010 WL 610778, at *5 (W.D. Tex. Feb. 19, 2010) ("Section 82.003 clearly places the burden of proof upon a plaintiff to establish one of the exceptions to non-liability; it is not an affirmative defense.").

Plaintiffs have failed to meet their burden of establishing that any of the seven exceptions apply in this case. The only exception that arguably applies here is the one found in § 82.003(a)(7), which waives the nonmanufacturing seller's immunity from liability if the plaintiff proves the manufacturer is "not subject to the jurisdiction of the court." TEX. CIV. PRAC. & REM. CODE § 82.003(a)(7)(B). A nonresident manufacturer, like Shina Med, is subject to the jurisdiction of a Texas court if it can be properly served and has established minimum contacts with Texas such that the court's "exercise of jurisdiction comports with traditional notions of fair play and substantial justice." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Plaintiffs aver that "a fact question exists as to whether the South Korean manufacturer of the [Syringe] at issue is subject to the jurisdiction of this Court" because South Korea does not permit service via postal channels under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"). Dkt. 50 at 14. This argument is completely misplaced.

Both the United States and South Korea are signatories to the Hague Convention, "a multilateral treaty . . . . intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988). The Hague Convention allows a plaintiff to effect service of process on a foreign individual in several ways. Most common is service through a "central authority," an entity each signatory country must establish "to receive requests for service of

6

documents from other countries." *Id.* at 698–99 (citing 20 U.S.T. 362, art. 2). "Once a central authority receives a request in the proper form, it must serve the documents." *Id.* (citing 20 U.S.T. 362, art. 5.).

Article 10(a) of the Hague Convention provides an alternative means of service, allowing service of process by mail so long as the receiving country does not object. *See* 20 U.S.T. 362, art. 10. Although South Korea has objected to service by mail under Article 10,[2] "service-by-mail under Article 10(a) is merely an alternative method of service, should the plaintiff elect not to—or improperly— serve a party through the Central Authority." *Koch Mins. Sàrl v. Bolivarian Republic of Venez.*, 514 F. Supp. 3d 20, 36 (D.D.C. 2020). *See also Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1508 (2017) (listing Article 10 service-by-mail as one of several "additional methods" of service approved by the Hague Convention other than the most common method—service through a Central Authority); *Marschhauser v. Travelers Indem. Co.*, 145 F.R.D. 605, 609 (S.D. Fla. 1992) ("Article 10 only provides for alternative means of service and for the sending of documents, and it has no bearing on Articles 3–6, which prescribe the normal method of service under the Convention."). The takeaway from this discussion is that an individual living in South Korean or a corporate entity created under South Korean law can be properly served under the Hague Convention. Not surprisingly in this age of international trade and travel, service by this means happens all the time. *See Applied Med. Distrib. Corp. v. AH Sung Int'l, Inc.*, No. SACV1401900JVSRNBX, 2016 WL 7626475, at *1 (C.D. Cal. June 2, 2016) (finding service on an individual living in South Korea proper under the Hague Convention); *Magic Carpet Ski Lifts, Inc. v. S&A Co.*, No. 14-CV-02133-REB-KLM, 2015 WL 4237950, at *3 (D. Colo. June 8, 2015) (finding service on a South Korean

---

[2] *See* Accession (with Declarations) to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters,, Republic of Korea, Aug. 1, 2000, 2121 U.N.T.S. 294, 296–98, available at https://treaties.un.org/doc/Publication/UNTS/Volume%202121/v2121.pdf.

corporation proper under the Hague Convention). Plaintiffs' core argument—that it would be impossible to properly serve the Syringe's manufacturer, Shina Med, a South Korean entity—thus fails.

To summarize, Texas law provides that Plaintiffs can only subject Allison Medical, as a nonmanufacturer seller, to liability for a products liability action if Plaintiffs demonstrate that the nonresident manufacturer, Shina Med, is "not subject to the jurisdiction of the court." TEX. CIV. PRAC. & REM. CODE § 82.003(a)(7)(B). To meet their stout burden, Plaintiffs must come forward and present evidence demonstrating that: (1) there are a lack of minimum contacts sufficient to subject Shina Med, the nonresident manufacturer, to the jurisdiction of the Court; or (2) service on Shina Med is impossible to accomplish. Plaintiffs have done neither.

Allison Medical is unquestionably a nonmanufacturing seller for purposes of § 82.003. Because there is no material factual dispute about whether any § 82.003(a) exception applies, Allison Medical is shielded from liability as an innocent seller under § 82.003. Accordingly, I recommend that Allison Medical obtain summary judgment on Plaintiffs' strict-liability claims.

But even if I were to find that Allison Medical is not protected as an innocent seller, Plaintiffs' strict-liability claims still fail for the reasons explained below.

### 2. *Manufacturing Defect*

"A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (quotation omitted). To recover on a products liability claim arising out of a manufacturing defect, the plaintiff must prove each of the following elements: (1) the product deviated from its intended design in a manner that renders it unreasonably dangerous; (2) the product was defective at the time it left the manufacturer; and (3) the defect was the producing cause of the plaintiff's

8

injuries. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 41–42 (Tex. 2007); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

"Texas law does not generally recognize a product failure standing alone as proof of a defect." *Cooper Tire*, 204 S.W.3d at 807. *See also Walker v. Thomasson Lumber Co.*, 203 S.W.3d 470, 475 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("The mere fact that an accident occurs with a product is not sufficient proof of a defect for purposes of strict products liability."). Instead, "a specific defect must be identified by competent evidence and other possible causes must be ruled out." *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004). In other words, "[t]he inference of defect may not be drawn from the mere fact of a product-related accident." *Cooper Tire*, 204 S.W.3d at 807 (cleaned up).

If a plaintiff has no direct evidence of a manufacturing defect, he may establish a defect through circumstantial evidence by proving both his proper use of the product *and* the product's malfunction. *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 n.5 (Tex. 1989) ("In a case where the plaintiff relies solely on circumstantial evidence to establish a defect, the plaintiff must present evidence of proper use of the goods to make a prima facie showing of the defect. In cases where the plaintiff relies on direct evidence—as opposed to relying solely on circumstantial evidence—to establish a defect, the plaintiff need not present evidence of proper use of the goods.").[3] A malfunction, in turn, may be shown by

---

[3] *Plas-Tex, Inc.* concerned a claim for breach of implied warranty of merchantability; however, the Court's pronouncement that a "plaintiff must present evidence of proper use of the goods" to establish a product defect in cases where the plaintiff relies solely on circumstantial evidence is not limited to implied-warranty cases. Both claims—implied warranty of merchantability and manufacturing defect—require the plaintiff show that the product was defective. And although "defect" is a term of art with different meanings depending on the cause of action asserted, in this case, such a distinction is without difference. In an implied-warranty case, "defect" means the condition of the goods renders them unfit for their ordinary purpose, while "defect" in a strict-liability case means a condition of the product that renders it unreasonably dangerous to persons or property. *See Plas-Tex, Inc.*, 772 S.W.2d at 444. Here, the Syringe cannot be unfit for ordinary use but not unreasonably dangerous, nor can it be unreasonably dangerous but fit for ordinary use—it's a zero-sum game. *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999) (describing the concepts of "defect" in strict-liability and

9

testimony from the product's user about the circumstances surrounding the event in question. *See Parsons v. Ford Motor Co.*, 85 S.W.3d 323, 329–30 (Tex. App.—Austin 2002, pet. denied).

Plaintiffs have not designated an expert witness who could offer an opinion on whether the Syringe was defective; thus, Plaintiffs must establish a defect through circumstantial proof. *See Plas-Tex, Inc.*, 772 S.W.2d at 444. Undaunted, Plaintiffs insist their injuries must have been caused by a defective product because "syringe needles ordinarily do not fragment during normal and expected use." Dkt. 50 at 11.

The Syringe in question is a single-use product, and there is no dispute that Moreno used a brand-new Syringe to inject his ED medication. Nonetheless, it cannot be argued that Moreno's use of a Syringe—which the FDA approved for the subcutaneous injection of diabetic insulin—for the intracavernous injection of his ED medication was a "proper use" of the product. *See Plas-Tex, Inc.*, 772 S.W.3d at 444 n.5 ("where the plaintiff relies solely on circumstantial evidence to establish a defect, the plaintiff must present evidence of proper use of the goods to make a prima facie showing of the defect"). Rather, Moreno's abnormal use of the Syringe was a substantial deviation from its intended purpose.

But even giving Plaintiffs the benefit of the doubt and construing Moreno's use of the Syringe as a proper use of the product, Plaintiffs' manufacturing-defect claim still fails because Plaintiffs have presented no evidence that the Syringe deviated from its intended design in a manner that rendered it unreasonably dangerous. *See Ledesma*, 242 S.W.3d at 41–42. In *Ledesma*, the Texas Supreme Court held in unambiguous terms that, to prove a manufacturing defect, a plaintiff must show the product in question deviated, in terms of quality or construction, from its specifications or planned output in a manner that renders the product unreasonably dangerous. *See id.* at 41. "This requirement," the Court continued,

---

implied-warranty actions as "functionally identical" where the plaintiff's strict-liability and implied-warranty claims stem from a single incident).

"is separate from, and in addition to, the requirements that the product was defective when it left the manufacturer and that the defect was a producing cause of the plaintiff's injuries." *Id*. at 41–42.

For these additional reasons, Plaintiffs' products liability claim based on an alleged manufacturing defect cannot withstand summary judgment.

### 3. *Marketing Defect*[4]

"A product cannot be said to be unreasonably dangerous because of a failure to warn unless there is a duty to warn." *Houston Lighting & Power Co. v. Reynolds*, 712 S.W.2d 761, 767 (Tex. App.—Houston [1st Dist.] 1986), *rev'd on other grounds*, 765 S.W.2d 784 (Tex. 1988). A seller's duty to warn arises only where the dangers to be warned of are reasonably foreseeable and are such that a consumer cannot reasonably be expected to be aware of them. *Id*.

The elements of a marketing defect claim are: (1) a risk of harm that is inherent in the product or that may arise from its intended or reasonably anticipated use of the product; (2) the supplier of the product knows or reasonably should foresee the risk of harm at the time the product is marketed; (3) the product has a marketing defect; (4) the lack of warnings or instructions renders the product unreasonably dangerous to the ultimate user or consumer; and (5) the failure to warn or instruct causes the user's injury. *Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 480 (Tex. App.--Houston [1st Dist.] 2007, pet. denied); *Goodyear Tire & Rubber Co. v. Rios*, 143 S.W.3d 107, 116 (Tex. App.—San Antonio 2004, pet. denied).

Critically, to recover based on the inadequacy of a warning, "[a] plaintiff must show that adequate warnings would have made a difference in the outcome,

---

[4] Plaintiffs' Second Amended Complaint repeatedly accuses Allison Medical of failing to adequately warn consumers of potential risks when using a Sure Comfort Insulin Syringe to inject ED medication. *See, e.g.*, Dkt. 30 at 9. "A defendant's failure to warn of a product's potential dangers when warnings are required is a type of marketing defect." *Grinnell*, 951 S.W.2d at 426.

11

that is, that they would have been followed." *Gen. Motors Corp. v. Saenz ex rel. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993).

Even if I were to generously assume that Moreno's use of the Syringe to inject his ED medication was a reasonably anticipated use of the product *and* that Allison Medical's conspicuous warning was insufficient to warn against said use, Plaintiffs have presented no evidence that Moreno would have followed a more specific warning. Instead, at deposition, Moreno testified that he only checked to confirm the Syringe was a 31-gauge needle and did not review the product's labeling. *See* Dkt. 45-5 at 4 ("No. Never paid attention to the brand of needles. Used them so many times for many years. I just saw it was 31 gauge, the correct needle size that went with the medication, and I used it."); *id.* at 6 ("I only needed to see that it was 31 gauge, a right size to use. I would assume that everything was correctly printed on there from the company, as it should be like the other syringes.").

For this additional reason, Plaintiffs' marketing-defect claim fails.

## B. BREACH-OF-WARRANTY CLAIMS

Breach-of-warranty claims require the plaintiff to prove the product was defective. *See Deeds v. Whirlpool Corp.*, No. CV H-15-2208, 2016 WL 6070552, at *10 (S.D. Tex. Oct. 17, 2016) ("To breach a warranty in a products liability suit there must be a defect in the product that renders it unreasonably dangerous.").

> A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling . . . the seller is not liable. Where, however, [the seller] has reason to anticipate that danger may result from a particular use . . . he may be required to give adequate warning of the danger . . . and a product sold without such warning is in a defective condition.

*Restatement (Second) of Torts* § 402A, cmt. h. "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." *Id.*, cmt. j.

As discussed, the Syringe contained a clear and prominent warning that it was to be used for "U-100 INSULIN ONLY." *See* Dkt. 45 at 2. Nonetheless, Plaintiffs insist that their claims for breaches of the implied warranties of merchantability and fitness for a particular purpose establish an alternative remedy to strict liability.

### 1. *Implied Warranty of Merchantability*

Under Texas law, a warranty of merchantability is implied in a contract for the sale of goods by a merchant unless the warranty is excluded or modified in accordance with statutory requirements. *See* TEX. BUS. & COM. CODE § 2.314(a). To prevail on a claim for breach of the implied warranty of merchantability, a plaintiff must prove the following elements: "1) the defendant sold or leased a product to the plaintiff; 2) the product was unmerchantable; 3) the plaintiff notified the defendant of the breach; and 4) the plaintiff suffered injury." *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App.—Tyler 2003, no pet.).

Section 2.314 provides a non-exhaustive list of minimum requirements for a product to be merchantable. TEX. BUS. & COM. CODE § 2.314(b). In their Second Amended Complaint, Plaintiffs allege that the Syringe was not fit and safe for its intended use or purpose, which falls under § 2.314(b)(3). *See* Dkt. 30 at 16.

For a product to be unfit for ordinary purposes, it must have a defect—i.e., the product lacks something necessary for adequacy. *See Plas-Tex, Inc.*, 772 S.W.2d at 444. That can occur when the product "does not accomplish the purposes for which it is manufactured, or when it is constructed in a manner which makes it unreasonably dangerous." *Polaris Indus.*, 119 S.W.3d at 336 (quotation omitted).

Further, regardless of the defective condition, a seller is not liable for breach of an implied warranty of merchantability if the consumer is injured using the product in a manner that is not reasonably foreseeable—i.e., product misuse. *See Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1099 (5th Cir. 1973). The most common form of product misuse is a failure to follow adequate directions or

warnings accompanying the product. For example, in *Procter & Gamble Manufacturing Co. v. Langley*, the plaintiff read and understood the instructions accompanying a home permanent hair wave product but nevertheless failed to follow them in several important respects. 422 S.W.2d 773, 778 (Tex. Civ. App.—Dallas 1967, writ dism'd). When injury resulted, the plaintiff sued the manufacturer, the wholesale distributor, and the retail seller for breach of implied warranty. The appellate court held that the plaintiff's violation of the plain instructions and warnings was a misuse of the product and constituted a defense to her cause of action. On rehearing, the court stated:

> We do not believe that the strict liability doctrine means [that] . . . a consumer may knowingly violate the plain, unambiguous instructions and ignore the warnings, then hold the makers, distributors and sellers of a product liable in the face of the obvious misuse of the product. Appellees brought their suit on the theory of implied warranty. *We agree that the product carried an implied warranty of fitness, but such warranty existed only if the product was used in accordance with directions. The implied warranty did not apply when the product was misused*, as it undisputedly was in this case.

*Id.* at 780 (emphasis added).[5]

The takeaway from *Langley* is that an implied warranty only exists when the product is used properly. Here, Plaintiffs have failed to show the Syringe, as made, was unsafe or unable to be used for its ordinary purpose—the subcutaneous injection of diabetic insulin. *See Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 854 (Tex. App.—Fort Worth 2005, no pet.) ("[F]or a defect to cause redressable damages in a breach of the implied warranty of merchantability action, it must cause the product not to function adequately in the performance of its ordinary

---

[5] As an aside, although the *Langley* court wrote "the product carried an implied warranty of *fitness*," 422 S.W.2d at 780 (emphasis added), the opinion makes clear that the court was discussing both the implied warranty of merchantability and fitness for a particular purpose. For example, two paragraphs before the above-quoted language, when discussing merchantability, the court stated: "[H]ad [the plaintiff] faithfully complied with the written instructions and heeded the written warnings and had nevertheless sustained injury the situation would be different. But no such situation is presented to us." *Id.*

14

function for the plaintiff."). Rather, Moreno's misuse of the Syringe to inject his ED medication was unforeseeable and went against the Syringe's clear and conspicuous warning that the product was for "U-100 INSULIN ONLY." *See* Dkt. 45 at 2.

In sum, while the Syringe carried an implied warranty of merchantability, that warranty applied only if the product was used in accordance with its warnings and directions. *See Langley*, 442 S.W.2d at 780. It is undisputed that Moreno used the Syringe in a manner that violated its express warning. Summary judgment should be awarded in favor of Allison Medical on the implied-warranty-of-merchantability claim.

### *2. Implied Warranty of Fitness for a Particular Purpose*

To prevail on a breach of implied warranty of fitness for a particular purpose, the plaintiff must prove that: (1) the seller had reason to know any particular purpose for which the goods were required at the time of contracting; and (2) the buyer was relying on the seller's skill or judgment to select or furnish suitable goods. *See* TEX. BUS. & COM. CODE § 2.315.

An important caveat is that the "particular purpose" must differ from the "usual and ordinary use of the goods." *See Coghlan v. Aquasport Marine Corp.*, 73 F. Supp. 2d 769, 774 (S.D. Tex. Oct. 8, 1999). That is, an implied warranty of fitness for a particular purpose does not arise unless the particular purpose differs from the good's usual and ordinary use. Rather, "the particular purpose must be some unusual, out of the ordinary purpose peculiar to the needs of an individual buyer." *Id*. *See* also TEX. BUS. & COM. CODE § 2.315, cmt. 2 ("A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business."). Here, it is safe to say that Moreno's particular purpose differed from the product's usual and ordinary use.

Plaintiffs' Second Amended Complaint argues: "[T]he evidence plainly establishes that Allison [Medical] knew its syringes were being used for the

15

particular purpose of administering ED medication via penile injection as of the fall of 2018. Nevertheless, Allison [Medical] did not take any steps to modify the product labeling or packaging to include any conspicuous writing to exclude or modify its implied warranty that Sure Comfort syringes were fit for this particular purpose." Dkt. 50 at 12–13.

First, this stretches the truth. Allison Medical was aware that *one consumer* misused a syringe to inject ED medication in the fall of 2018. Knowledge of one consumer's misuse of a product is generally insufficient to demonstrate that the seller had reason to know that other consumers would similarly misuse the product.[6] Second, and more importantly, Plaintiffs have not presented any evidence that they relied on *Allison Medical's* skill or judgment in selecting the Syringe. The claim for breach of an implied warranty of fitness for a particular purpose thus fails as a matter of law.

### 3. *Express Warranty*

There is no evidence whatsoever that Allison Medical created or breached an express warranty. *See* Dkt. 45 at 11–12. *See also* TEX. BUS. & COM. CODE § 2.313(a) (explaining circumstances that give rise to an express warranty by the seller). Plaintiffs' Response to Allison Medical's Motion for Summary Judgment seemingly acknowledges as much, as it does not once mention their pleaded claim for breach of an unspecified express warranty. *See* Dkt. 50.

### C. NEGLIGENCE

Traditionally, strict products liability and negligence are separate causes of action with different elements. *See Ford Motor Co. v. Miles*, 141 S.W.3d 309, 315 (Tex. App.—Dallas 2004, pet. denied). However, the Fifth Circuit has recognized

---

[6] Here, this is especially true, considering the Syringe at issue was part of "Lot # 181105AS," which consisted of 600,000 syringes. Dkt. 45-2 at 3. Allison Medical "has received no other complaints related to Lot # 181105AS." *Id. Cf. Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 11–12 (Tex. 2015) (holding three similar accidents involving the same type of misuse insufficient to demonstrate the product was unreasonably dangerous where the defendant sold more than 100,000 models of the allegedly defective product).

that, where the negligence cause of action is premised only on allegations and evidence directed to whether the product is unreasonably dangerous, failure to prevail on a strict-liability cause of action necessarily dooms the negligence cause of action as well. *See Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 256–57 (5th Cir. 1988). Here, Plaintiffs' negligence claim arises out of the same factual basis as their products liability claim—that is, Allison Medical's designing, manufacturing, and marketing of the Syringes. As a result, Plaintiffs' negligence theory is encompassed and subsumed in their defective-product theory. *See Miles*, 141 S.W.3d at 315; *Shaun T. Mian Corp.*, 237 S.W.3d at 857.

### D. DTPA

The DTPA permits consumers to maintain an action for breach of an express or implied warranty that is a producing cause of the consumer's economic or mental-anguish damages. *See* TEX. BUS. & COM. CODE § 17.50(a). Plaintiffs' DTPA claim is based on Allison Medical's alleged breaches of the implied warranties of merchantability and fitness for a particular purpose. *See* Dkt. 30 at 13. Because Plaintiffs have failed to survive summary judgment on the implied warranty claims on which their DTPA claim is based, Allison Medical is entitled to summary judgment on Plaintiffs' DTPA claim as well. *See, e.g., Para-Chem S., Inc. v. Sandstone Prods., Inc.*, No. 01-06-01073-CV, 2009 WL 276507, at *16 (Tex. App.—Houston [1st Dist.] Feb. 5, 2009, pet. denied).

### E. PLAINTIFFS' REQUEST FOR ADDITIONAL DISCOVERY

Plaintiffs conclude their response to Allison Medical's Motion for Summary Judgment with a request to conduct additional discovery. *See* Dkt. 50 at 14. Plaintiffs claim that their response was filed "without the benefit of Plaintiffs having deposed expert witnesses of the Defendants [sic]." *Id.*

I am puzzled by this request. The discovery deadline set forth in the Docket Control Order was February 8, 2022. *See* Dkt. 43. Plaintiffs filed their summary-judgment response on February 14, 2022, which means that they had the entire

discovery period to conduct the discovery needed to prepare for trial and respond to the motion for summary judgment.

Technically speaking, Plaintiffs' request for additional discovery falls within the purview of Rule 56(d), which requires a nonmovant show "by *affidavit or declaration* that, for specified reasons, it cannot present facts essential to justify its opposition" to the summary-judgment motion. FED. R. CIV. P. 56(d) (emphasis added). Plaintiffs offer no explanation as to why they were unable to obtain expert depositions during the discovery period, much less present affidavit or declaration testimony explaining why I should defer ruling on Allison Medical's Motion for Summary Judgment. Accordingly, the request for additional discovery is denied.

## CONCLUSION

For the reasons explained above, I recommend that the Court **GRANT** Defendant Allison Medical, Inc.'s Motion for Summary Judgment (Dkt. 45) and **DISMISS** Plaintiffs' claims with prejudice to refiling.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

Signed on this 9th day of August 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE